[Civ. No. 15514.   Second Dist., Div. One.   Feb. 10, 1947.]

RAE BUFFINGTON et al., Respondents, v. EDWARD C. NICHOLSON, Appellant.

Gold & Needleman, Warren E. Libby and Denny Fred for Appellant.

David Welts and John S. Cooper for Respondents.

YORK, P. J.—The plaintiffs Buffington, husband and wife, sued to recover damages for injuries alleged to have been sustained by Mrs. Buffington when she was attacked and bitten

by defendants' dog. From a judgment awarding said plaintiffs the sum of $5,268 and costs, and from an order denying his motion for a new trial, defendant Edward C. Nicholson has perfected this appeal.

It appears from the record that appellant, the owner of a male pedigreed Doberman pinscher dog named "King," and respondent W. L. Buffington, the owner of a female pedigreed Doberman pinscher dog named "Tina," entered into an oral agreement in April of 1944 to mate the dogs, appellant to receive one female puppy as a "stud fee." Pursuant thereto, appellant delivered his dog to respondents at their residence and turned him over to Mr. Buffington. About two weeks thereafter, on May 6, 1944, around five o'clock in the afternoon, when Mrs. Buffington, who had been feeding both dogs for about a week, entered the gate of the kennel carrying two pans of food, the dog King came toward her showing his teeth, leaped upon her with both paws and bit her on the right wrist and hand. She held the dog's mouth, from which the tissues of her hand were hanging like cords of thread, whereupon the dog relaxed his hold on her right hand but grabbed and bit her on the left forearm. Mrs. Buffington then kicked off her yard shoes, opened the gate and turned around in an effort to get away from the dog which grabbed her on the left side below the waist inflicting severe lacerations.

Mrs. Buffington's acquaintance with the dog King dated from the day he was brought to her residence. However, some weeks prior thereto, Mr. Buffington had witnessed a demonstration of King's "police training" at the movie studio where he was employed, at which time his business associate, Mr. Weston, who participated in the demonstration, told Mr. Buffington: "Don't use a club with that kind of dog." Mr. Buffington testified: "He had the dog there . . . I believe somebody else held the dog by the collar and he picked up a paper or something, it looked like a stick. Q. And made a threatening gesture at the dog? A. Yes. Q. And what did the dog do? A. He showed his teeth then." Mr. Buffington further testified that he acquired no knowledge from this demonstration of any propensities of the dog King to attack or bite, except when threatened with a stick; that neither Mr. Weston nor appellant ever demonstrated to him the male dog's watch or guard training. Also, that previous to the attack, the dog showed no signs of being a dangerous animal; never threatened to bite anyone while in his possession; showed no

signs of viciousness when he whipped the dog to make it mind; that he had no occasion to warn his wife about the dog and did not do so; and that his information that the dog was vicious and had bitten several people was acquired after the attack on Mrs. Buffington.

Mrs. Nicholson testified to two instances occurring prior to the incident here, when King bit other persons: (1) When the dog had been put into the den of appellant's home and told to stay there, Miss Moore, a guest, who had been drinking "came screaming into the house and rushed into the den and the dog jumped at her and attacked her"; (2) "Mrs. Chapman and her son came up to visit me in the afternoon. I was alone at the house and the dog was with me in the living room, and Billy and I were sitting there talking and his mother came up to the back door, instead of calling or ringing the doorbell she walked in, and before I had a chance to get hold of King he had grabbed her when she was not more than about four or five feet inside the door. She also said, 'I should never have walked into the door without ringing or without letting you know I was there.' "                                      ,

Appellant, Edward C. Nicholson, testified that when he delivered the dog to respondents he "expressed the thought to Mr. Buffington that he (the dog) was police trained, he was aggressive, and he wouldn't stand for any strangers. . . . Q. Was anything said or discussed by any of you with respect to how King should be approached in the kennel? A. Yes. I mentioned that since he was in a strange environment with strange people that he could be handled, he would in time become very loyal and affectionate to them, and I said, 'The first couple of weeks that he is here,' I said, 'be just a little cautious and call his name, and when the dog comes toward you, stop for just a minute and let him recognize you, and you will be all right.' Q. Did you say that in the presence of Mrs. Buffington? A. I don't remember; I mean it was a four-way conversation all the way around and she was talking to Mrs. Buffington and I was talking to Mr. Buffington, and then we talked back and forth. . . . Q. Are you sure that at least Mr. Buffington heard that statement? A. Mr. Buffington heard that statement because we talked dogs there for at least an hour and a half." This witness also testified to other situations subsequent to May 6, 1944, when the dog King bit other persons:

"Mr. King was part of the real estate firm that sold me my house, and his office was on Laurel Canyon and Ventura Boulevard, . . . I would stop in and talk to him. . . . This one day I was driving along down there and I stopped, and I had King on the leash with me . . . it was rather hot, and I said, 'Would you care to go across the street and have a glass of beer? . . . I will put my dog in the car' . . . and he said, 'No, it is so hot . . . we will leave the dog in the office.' I said, 'I don't dare leave the dog in the office because somebody might come in, a stranger might come in, and then there would be trouble.' He said, 'I am the only person who has a key to the office, I will lock it, and I will not come back in until you do.' I said, 'Well, if you promise me on your word of honor not to go back in . . . I will agree to it.' " The two men had their drink and appellant left Mr. King to make a telephone call. When he returned "and looked for Mr. King he was not there. So I went back across the street and he had opened the door with his key, and he had gone in, and no sooner had he put his hand in than the dog got him, so he went against his promise and all my warnings."

On another occasion, when appellant was giving a party at his house, the dog was "running loose . . . not bothering anybody," when a young woman under the influence of liquor came in. Appellant said to her "Please do not molest the dog . . . if he wants to come to see you, that is all right, but just leave him alone." Appellant then placed King way over in the corner and told him to lie down and stay there, which he did. "Well, this girl came in, she borrowed a bathing suit and went swimming, and she came back and had two or three more drinks, and she said, 'I want to pet the dog.' I said, 'Please leave the dog alone; please don't bother him.' . . . I turned to mix another drink. In the meantime I saw her walking over to try to pet the dog, and she said, 'Hello, fellow,' or something like that, and stumbled around, and King just looked at her and growled just to warn her to please stay away from him. So she used some very foul language, picked up an empty bottle that was sitting on the bar, and went to strike at him. I tried to climb across the bar, but by the time I got to her King had done his damage."

It is here contended that the owner of a dog is not liable under the California dog bite statute when the person bitten has exclusive possession of the dog under a bailment agreement, appellant urging in this regard "that the liability rests

on the keeper and not the owner as such, unless at the time of the incident he had actual possession of the dog or had constructive possession through an agent or servant.''

The so-called dog bite statute, (1 Deering's Gen. Laws, Act 384a, Stats. 1931, p. 1095) reads as follows: ''The owner of any dog which shall bite any person while such person is on or in a public place, or lawfully on or in a private place, including the property of the owner of such dog, shall be liable for such damages as may be suffered by the person bitten, regardless of the former viciousness of such dog or the owner's knowledge of such viciousness. . . .''

In *Hicks* v. *Sullivan,* 122 Cal.App. 635, 639 [10 P.2d 516], the court analyzed said statute as follows: ''This statute does not purport to limit the recovery of damages actually suffered as the result of an attack by a savage dog, to the physical wound from biting. It creates a liability when the complainant is actually bitten without the usual necessity of proving the previous vicious character of the dog, or the knowledge of its dangerous habits on the part of the owner.''

Similarly in *Goldberg* v. *Rabuchin,* 65 Cal.App.2d 111, 114 [149 P.2d 861], it was stated: ''Under the Dog Bite Statute of 1931, *supra,* the (1) former viciousness of a dog causing injuries, or (2) owner's lack of knowledge of such viciousness, is immaterial.''

On the other hand, it is stated in 2 American Jurisprudence 734, section 53: ''A statute imposing liability on the 'owner' of a dog without regard to knowledge of his vicious nature does not apply to one merely harboring or keeping a dog not owned by him, and, to render him liable, *previous knowledge of the dog's vicious nature must appear.''* Likewise, in *Menches* v. *Inglewood Humane Soc.,* 51 Cal.App.2d 415, 417 [124 P.2d 870], the court stated: ''Much of the discussion presented by respondents' brief is to the effect that the society was the owner of the animal and therefore itself and its servants are liable, while appellants contend that the society was merely a keeper and had no title or ownership of the dog or knowledge of its vicious tendencies. It may here be observed that liability for the bite of a dog may attach not only to the owner without reference to knowledge, but also to a keeper as well *if the latter has knowledge of the viciousness of the animal.''* (Emphasis added.)

Since the gist of the tort, ''is the keeping of a thing known to be dangerous, one who keeps or harbors an animal owned

by another may be liable, if he has such knowledge. A bailee with scienter is of course liable." Prosser or Torts, chapter 10, section 57, page 441.

"A person, although not the owner of a vicious dog, may make himself liable to others by knowingly keeping or harboring the dog upon his premises, *after knowledge of his vicious propensities,* and this is true even when such keeping is without the consent and against the wishes of the animal's owner. . . . The owner of an animal is the person to whom it belongs. Whether or not a person is a keeper depends upon the peculiar facts and circumstances of each individual case. A man may own an animal and yet not be its keeper. The word 'keeper' is equivalent to 'the person who harbors.' Harboring means protecting. So one who treats a dog as living at his house, and undertakes to control his actions is the owner or keeper within the meaning of the law; *but the casual presence of an animal on his premises, if not so treated, does not constitute him such owner or keeper."* (3 C.J.S. 1266, § 165.) (Emphasis added.)

From the foregoing it is obvious that a keeper in contrast to an owner, is not an insurer of the good behavior of a dog, but must have scienter or knowledge of the vicious propensities of the animal before liability for injuries inflicted by such animal shall attach to him.

Appellant concedes that there was a duty on his part to inform the bailees with whom he dealt of any dangerous propensities of the bailed dog, but, he urges that he "adequately disclosed the dangerous nature of the dog when he participated with Mr. Weston in the demonstration for Mr. Buffington. . . . The important point is that appellant did inform respondent, Mr. Buffington, that the dog was trained to attack and bite people, if necessary, in certain circumstances, which automatically makes him a dangerous dog and that the dog's propensity to do what he actually did do, presumably an unprovoked attack on his keeper, was as unknown to appellant as it was to respondents."

Respondents deny that appellant ever cautioned them of the dog's vicious propensities and further deny that they had any knowledge thereof, except that he would attack if threatened with a stick.

In the condition of the record, it became a question of fact for the court to decide whether respondents had such knowledge of the vicious propensities of the dog here in ques-

tion as would relieve appellant from liability for the injuries received by Mrs. Buffington. ▮ The court found upon directly contradicted evidence that appellant "negligently and carelessly failed to disclose to plaintiffs, or either of them, at or prior to so placing his said dog 'King' with plaintiffs, that said dog was vicious, or that he had theretofore attacked and seriously injured other persons, all of which said facts the court finds were true and well known to the said defendant Edward C. Nicholson at and prior to the time he placed his said dog 'King' with plaintiffs'' and also that the injuries inflicted upon respondent were the direct and proximate result of such carelessness and negligence of appellant.

The record discloses amply sufficient evidence to support the findings made by the trial court.

For the reasons stated, the judgment is affirmed; the appeal from the order denying motion for a new trial is dismissed.

Doran, J., and White, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 3, 1947.